71 So.2d 513

**JORDAN v. CITY OF MOBILE.**

**1 Div. 574.**

Supreme Court of Alabama.

March 4, 1954.

Johnston, McCall & Johnston, Mobile, for appellant.

Albert J. Tulley, Mobile, for Personnel Board of Mobile County.

Fred G. Collins, Mobile, for appellee.

STAKELY, Justice.

This cause arose under the local act and amendments thereto which provide for the creation of the Personnel Board for Mobile County and the Rules and Regulations adopted by that Board. Local Acts of Alabama, 1939, p. 298 et seq.

On April 29, 1953, Ralph Jordan (appellant), a police officer of the City of Mobile, received from the Board of Commissioners of the City of Mobile a letter dismissing him from the service of the Mobile Police Department. In substance the letter advised him that upon charges filed by Mrs. Margaret Monroe of Mobile, Alabama, he was dismissed · from ·the services of the Mobile Police Department and his employment terminated on April 30, 1953, for conduct unbecoming an employee in the public service.

Ralph Jordan thereupon appealed in writing from the action and decision of the Board of Commissioners of the. City of Mobile and at the same time answered the charges in writing, as follows: "(1) He is not guilty. (2) At the time and place complained of he was performing his duties as a public officer of the City of Mobile and acting within his authority and rights as such public officer."

Ralph Jordan was tried on May 25, 1953, before the Personnel Board at which time evidence was offered to the Personnel Board by both the City of Mobile and by Ralph Jordan.

On June 3, 1953, an order was made by the Personnel Board of Mobile County, with a dissent of one member, modifying and altering the decision of dismissal of Ralph Jordan by the Board of Commissioners of the City of Mobile, to suspension from active duty without pay from April 30, 1953, through and including June 15, 1953, and ordering that "the employee shall thereafter be fully restored to active duty."

Thereupon the City of Mobile appealed from the decision of the Personnel Board of Mobile County to the Circuit Court of Mobile County. The Circuit Court of Mobile County upon hearing the cause entered an order on July 20, 1953, holding that the portion of the order of the Personnel Board of Mobile County modifying and altering the order of the Board of Commissioners of the City of Mobile, by substituting suspension of Ralph Jordan for dismissal as ordered, "was unlawful and it was thereby vacated." The appeal here is from the order of the Circuit Court of Mobile County.

A considerable amount of testimony was introduced on the hearing before the Personnel Board. It is not practicable to set it all out in detail, but we shall attempt to summarize the salient facts in order to give an understanding of the case. Ralph Jordan (appellant) is 37 years of age and has

been a Police Officer of the City of Mobile for approximately thirteen years, except for 24 months on military duty. He entered the service of the Police Department in 1940. His service as a police officer is rated as "outstanding."

Mrs. Margaret Monroe, who filed the charges against Ralph Jordan, lives at 108 So. Franklin Street in the City of Mobile, where she has resided for the last nine years. Her daughter, Mrs. Melanie Turner, had two children by a former marriage, namely, Jean McAtee, 9 years of age, and Frank McAtee, 11 years of age. About the middle of January 1953 Mrs. Margaret Monroe's daughter Melanie, who had worked for several years to support her children and mother and who had remarried, moved to Jasper, Alabama, taking along her daughter Jean McAtee but leaving her son Frank McAtee temporarily in Mobile. Mrs. Margaret Monroe was opposed to the marriage of her daughter.

On the Friday before Easter, Mr. and Mrs. Turner together with her daughter Jean McAtee returned to Mobile from Jasper, Alabama, for Easter. The girl telephoned her brother Frank McAtee Saturday morning and Mrs. Turner took the children to her mother's house. That night Jean spent the night with her brother and grandmother, Mrs. Monroe, at the latter's house. The next morning, Easter Sunday, Mrs. Turner went to Mrs. Monroe's home to get the children to take them to Sunday School, but the boy had already gone. They attended Sunday School but did not stay for church. Mrs. Turner and her husband, however, went to church and afterwards took the children out to their other grandmother's for dinner, keeping them there until 3:00 or 4:00 o'clock in the afternoon. Mrs. Monroe having promised to let her daughter Melanie have her clothes which she would not let her have at the time of her marriage, Mrs. Turner drove by her mother's house in the afternoon and upon arrival there the children stated that they were going across the street and play with a girl friend. When Mrs. Turner had packed the clothes she called by telephone for her children and requested that they be told to come home, that they were ready to leave. She was told by the friend that they would come. Mrs. Turner waited for sometime and the children did not show up. Mrs. Turner made a considerable effort to find the children and then said to her husband, "We have just got to do something. Something is wrong. My children haven't come home." It was necessary for a return to be made to Jasper that evening since her husband had to go to work the next morning. Mrs. Turner then called the police and all of them drove around the neighborhood looking for the children. On returning to Mrs. Monroe's house, Mrs. Turner was informed the children had not yet come home. Sometime later the boy appeared and when his mother inquired where Jean was he stated that he was not going to tell her. Mrs. Turner then sought to prevail upon her mother, Mrs. Monroe, to aid her in ascertaining from the boy where Jean was, but Mrs. Monroe said, "No, I am not going to do it." The first call to the police, according to Mrs. Turner, was early in the evening.

According to the Policeman Ivon Swift, he and his partner, Policeman Barnes, who patrolled by automobile, received a call Easter Sunday evening about a lost child. They made a search for the child but were not successful. They went to the home of Mrs. Monroe. Being informed that Mrs. Monroe would not let any officer enter her house without a search warrant, they decided to call Detective Ralph Jordan into the case. He was their superior officer in this particular area. Mrs. Turner told the officers that she believed the children were in the house of Mrs. Monroe. According to the officers, the boy came to the door of Mrs. Monroe's house and talked to his mother three or four times.

When Ralph Jordan appeared he asked Mrs. Monroe where the little girl was and was told by her that she did not know. The screen door on the front porch of the house of Mrs. Monroe was latched. Officer Ralph Jordan hit the screen door with his hand several times and it came open. Policeman Lockler, who was with Ralph Jordan, opened a door to the stairway inside the

house and found the little girl Jean. The boy Frank screamed and cut up generally and there was considerable commotion in the house. The officers decided that it was better to take all of them down to the station where the matter could be settled.

When Ralph Jordan at the call of the other policemen reached the home of Mrs. Monroe, he first knocked upon her door and called but no one answered. He then called out to Mrs. Monroe and stated that Mr. and Mrs. Turner were outside and believed the children were inside the house and that she wanted the children as she was to return to Jasper that night. He asked Mrs. Monroe to open the door and she replied that she was not going to do it. She told them that they could not come in without a search warrant. He asked Mrs. Monroe where the girl was and she stated that she did not know. He asked the boy where his sister was and he began to cry and scream that neither he nor his sister were going to go back with his mother and Jim Turner. When the girl was found Mrs. Turner tried to get her to go with her while the boy was running around shouting and screaming at the top of his voice. It was then that the officers decided that the matter could best be straightened out at police headquarters.

The first time that Ralph Jordan heard about the missing child was when the report came to him over the radio and he went around to the home of Mrs. Monroe. Prior to that time he had never known either Mrs. Monroe or Mrs. Turner.

At the time of the dismissal of Ralph Jordan as a Police Officer and for a long time prior thereto there was and had been in force and effect Rule 14.7 adopted by the Personnel Board of Mobile County as follows:

"Decision. 14.7 The hearing on appeal shall be de novo, and the Board may rescind, modify, alter or affirm the penalty imposed by the appointing authority, or may impose such additional or different penalty as may be warranted by the evidence adduced at the hearing. Within ten days after the conclusion of the hearing, the Board shall render its decision which shall forthwith be certified to the appointing authority and be enforced by him. Copies of the decision shall be delivered to all other parties at interest."

After reviewing the evidence and making its finding the Personnel Board said: "For these reasons, including the attendant circumstances which we have mentioned, the Board finds that 'the City Commission was warranted in taking some disciplinary action against this employee'." The order then says:

"The evidence further shows and the Board finds that Mr. Jordan did not act maliciously nor with any thought or desire to violate the law. He was called upon to perform a duty and to make a decision amidst confusion and in an emergency. He has been an employee of the Police Department for thirteen years during which time he has had excellent service ratings from his superiors in the department. For the past five years his service ratings, presumably approved by the Chief of Police and two other superior Officers, were 'Outstanding'. The opinion of the City Officials, expressed through these service ratings, is that the service of this employee has generally ranged from 'Excellent' to 'Outstanding'.

"Because of these circumstances, and the outstanding service rating of the employee, it is the decision of the majority of the Board that the action of dismissal heretofore imposed upon the employee, Ralph Jordan, be and the same is hereby modified and altered to suspension from active duty, without pay, from the 30th day of April, 1953, through and including the 15th day of June, 1953, and that the employee shall thereafter be fully restored to active duty."

Without doubt the evidence before the Personnel Board shows that Ralph Jordan was a Police Officer with a fine service record, in fact an outstanding record. On the occasion out of which the present complaint arose, he was confronted with a

difficult and perplexing situation. The little girl Jean had been on the list of missing persons since about 5 o'clock of the afternoon of Easter Sunday. Her mother was frantic and she and her husband were anxious to leave Mobile at once in order to return to Jasper, Alabama, where her husband had to go to work the next morning. It appears that Mrs. Monroe, the mother of Mrs. Turner, was hiding the little girl in her house. When the officers reached the scene of the trouble, Mrs. Monroe had informed her daughter who in turn informed the officers, that no officer was coming into her house without a search warrant. If as a matter of fact Mrs. Monroe was concealing and detaining the little girl from her mother, she was violating § 5, Title 14, Code of 1940, which reads as follows:

"Any person * * * who unlawfully detains any child from its parents, guardian or other person having lawful charge of it, shall, on conviction, be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than two years."

Section 154, Title 15, Code of 1940, authorizes an officer, without warrant, on any day at any time to arrest a person without a warrant for any public offense committed in his presence. Under § 155, Title 15, Code of 1940, an officer has authority to break open an outer or inner door of a dwelling house for an offense actually committed in his presence or on pursuit, if after notice of his office and purpose, he is refused admittance.

Whether Ralph Jordan was actually guilty of trespassing or entering the house of Mrs. Monroe without a warrant is a matter which might be seriously argued. Counsel call our attention to the decision by the Supreme Court of the United States in McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153. In that case the differing views of the Justices gives an idea of the complexity of the legal problem involved. In the present instance Ralph Jordan was only a Police Officer, although he had thirteen years experience and an outstanding record as a Police Officer with the City of Mobile. Yet under the circumstances he was held to the strictest accountability by the Board of Commissioners of the City of Mobile with no allowance for innocent error of judgment as to a problem of law which to say the least has been shown to be perplexing to the highest court in the land.

There is no doubt that on the occasion at the home of Mrs. Monroe there was great excitement. The mother was hysterical. Her child had been lost and had been missing for hours. Assuming for the sake of argument that Ralph Jordan may have made some mistake in determining the precise limit of his authority, yet he was permanently dismissed from the police service of Mobile, which meant a termination of his record of years of outstanding service and the loss of service benefits accruing to him as a police officer of the City of Mobile. His good faith or motive is not questioned. And there is no doubt that he was making an effort to discharge honestly his duties as a police officer. None of the parties were known to him and it is not shown that either in his words or his actions was there anything approaching those of a hoodlum. Yet it is contended by the City of Mobile and was so determined by the Circuit Court of Mobile County that Ralph Jordan has no relief.

While the power of the Personnel Board to make rules does not appear to be questioned, it is insisted that Rule 14.7 is contrary to the power given under § 22(a) of Act No. 470, Local Acts 1939, p. 298, which reads as follows:

§ 22(a). "An Appointing Authority may dismiss a Classified Employee whenever he considers the good of the service will be served thereby, for reasons stated in writing, served on the affected employee, and a copy furnished to the Director, which action shall become a Public Record; the dismissed employee may, within ten days after notice, appeal from the action of the Appointing Authority by filing a written answer to the charges. The Board may after investigating order a Public Hearing upon notice to, and opportunity to be heard by, the employee and

if the charges are proved unwarranted, order the reinstatement of the employee under such conditions as the Board may determine."

It is further insisted that an administrative board cannot pass a rule that is not either expressly or impliedly authorized by the Act, because for the board to do so places the board in the position of the legislature and such a rule is not authorized and is void.

We quite agree that the delegation of power to make rules and regulations cannot extend to the making of rules which subvert the statute giving such power or which repeal or abrogate the statute. Am. Jur. Vol. 42, p. 355. In State v. Friedkin, 244 Ala. 494, 14 So.2d 363, 366, this court cited with approval Parke v. Bradley, 204 Ala. 455, 86 So. 28 in the following language: "The power to make rules conferred by the Chiropody Act is well within legislative competency to delegate to the board. But the board must act within the standards thus declared, and not legislate in any respect."

Upon a careful consideration, we do not consider that Rule 14.7 enacted by the Personnel Board is contrary to the authority given the board by the statute. In considering the matter it is well first of all to note the objects and purposes sought to be accomplished by the Civil Service Act, Local Acts 1939, p. 298, and the amendments thereto.

In the case of City of Birmingham v. Wilkinson, 239 Ala. 199, 194 So. 548, 554, this court in speaking of the objects and purpose of the Civil Service Act for Jefferson County, said:

"In Yeilding v. State ex rel. Wilkinson, 232 Ala. 292, 167 So. 580, 582, a proceeding to test the constitutionality of the Civil Service Act, supra, we held: 'The one dominating purpose and thought of the lawmakers, in adopting the act now before us, was to secure greater economy and a better and more efficient administration of the affairs of the counties and cities affected by the act.'

"It is none the less true that as a means to these ends Merit System Acts look to security of the faithful officer or employee, in the permanence of his employment, at least for the period prescribed by law, and to getting away from the spoils system with its evils in the matter of efficiency and economy, and in the building of the political machine."

To the same effect see Heck v. Hall, 238 Ala. 274, 190 So. 280.

We quote from the Act to show the power of the Personnel Board to make rules and regulations for the administration and enforcement of the Act.

" 'Rules' mean the regulations adopted by the Board for carrying out the provisions of this act."

Subdivision 2 of Section 7 of the Act provides:

"It shall be the duty of the Board as a body * * * After a Public Hearing or Hearings to adopt and amend Rules and regulations for the administering of this Act, as hereinafter provided."

Subdivision 3 of Section 8 of the Act provides:

"It shall be his (director's) duty to: * * * (3) Prepare and recommend Rules and regulations for the administration of this Act."

Section 9 reads as follows:

"(a) The director shall recommend such Rules as he may consider necessary, appropriate, or desirable to carry out the provisions of this Act, and may from time to time recommend amendments thereto. When such Rules or amendments are recommended by the Director, the Board shall hold a Public Hearing thereon, and at or after such hearing shall approve or reject the recommendations of the Director wholly or in part or to modify them and approve them as so modified. Rules hereunder shall be recommended by the Director with or without the advice of any appointing authorities as soon as

practicable after his appointment. The Board shall have power on its own initiative to propose Rules, amendments or additions to the Rules and, after holding a Public Hearing thereon, adopt, modify, or reject them.

"(b) Rules adopted under this section shall have the force and effect of law.

"(c) Among other things, such Rules shall provide for the methods of administering the Classification Plan and the Pay Plan; the establishment, maintenance, consolidation, and cancellation of Lists; the charge, if any, to be made for receipt of applications or admission to Tests; the application of Service Ratings; the hours of work, attendance regulation, and leaves of absence for employees in the Classified Service; and the order and manner in which Layoffs shall be effected. Such Rules may include any provisions relating to the Classified Service, not inconsistent with the laws of the state, which may be necessary or appropriate to give effect to the provisions and purposes of this Act.

"(d) The powers herein conferred upon the Director shall be subject only to the provisions of this Act and of the Rules adopted hereunder, and may be exercised by regulation or by order as the Director sees fit. His powers and duties shall not be limited or restricted by the authorization to adopt Rules, except to the extent that Rules are adopted thereunder."

From the foregoing it is evident that the board is authorized to adopt rules tending to the proper, efficient and just administration of the act. It appears that such rules and regulations so adopted are valid where they tend (a) to greater economy and better and more efficient administration of the affairs of the city or (b) to the security of the employees. We do not consider that the mere fact that the legislature saw fit to declare by Section 22(a) what the judgment of the board should be when a charge against an employee is proven unwarranted, that this inhibits the board or limits its powers to adopt rules governing cases where the grounds for dismissal are technical or the cause therefor trivial, followed by severe and excessive punishment by the appointing authority, namely, the city or the county. If it be appropriate or necessary to the just administration of the act that the board modify excessive punishment, then surely it is empowered to adopt a rule to that effect. We believe that the decisions of this court sustain this position. State ex rel. Bond v. State Board of Medical Examiners, 209 Ala. 9, 95 So. 295; State v. McCarty, 5 Ala.App. 212, 59 So. 543; Ferguson v. Starkey, 192 Ala. 471, 68 So. 348; State v. Keel, 33 Ala.App. 609, 35 So.2d 625; Lehmann v. State Board of Public Accountancy, 208 Ala. 185, 94 So. 94; Parke v. Bradley, 204 Ala. 455, 86 So. 28; Heck v. Hall, 238 Ala. 274, 190 So. 280; State v. Friedkin, 244 Ala. 494, 14 So.2d 363; Alabama Public Service Commission v. Mobile Gas Co., 213 Ala. 50, 104 So. 538, 41 A.L.R. 872; Railroad Commission of Alabama v. Alabama Great Southern R. Co., 185 Ala. 354, 64 So. 13, L.R.A.1915D, 98; American Trucking Ass'n v. U. S., 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337.

It is argued that what we have said is contrary to the maxim expressio unius est exclusio alterius, but this legal maxim expresses a rule of construction and not one of substantive law and its only service is as an aid in discovering the legislative intent when it is not otherwise manifest. United States v. Barnes, 222 U.S. 513, 32 S.Ct. 117, 56 L.Ed. 291; State ex rel. Bond v. State Board of Medical Examiners, supra. This rule does not prevail in the construction of a statute where to follow it would lead to an unjust result contrary to legislative intent. It is a part of the fundamental policy of our law that no greater punishment shall be inflicted than the nature and degree of the offense warrants. For instance, we refer to the constitutional provision that, excessive bail shall not be required nor excessive fines imposed, nor cruel and unusual punishment inflicted. Constitution of 1901, §§ 15, 16.

Accordingly when a statute is under interpretation, the very purpose of which is remedial, as for example in Heck v. Hall, supra, and which has for one of its chief objects the security of the faithful employee, none should be allowed that renders punishment of the employee greatly disproportionate to his offense, and which nullifies the authority of the very instrument, the Personnel Board of the Civil Service Law, through which those salutary and beneficent results are to be accomplished. It would not do to repose in the Personnel Board duties and powers quasi-judicial by nature, In re Fredericks, 285 Mich. 262, 280 N.W. 464, 125 A.L.R. 259; Handlon v. Town of Belleville, 4 N.J. 99, 71 A.2d 624, 16 A.L.R.2d 1118, such as the hearing and trial upon appeal of charges against civil service employees and then to deny to the board the authority to do justice. To do that would be to make the board a powerless body and not the instrument designed to do justice and to promote the beneficent purposes of the act.

In fact it does not seem to us that even the language of Section 22 (a) authorizes the construction adopted by the city and accepted by the court below. It would hold the Personnel Board powerless to relieve an employee of an arbitrary and unwarranted penalty even where some grounds existed for disciplinary action. The provision that the Personnel Board may "order the reinstatement of the employee" under such conditions as the Board might determine, is an indication of legislative intent and purpose to provide a protection against arbitrary action in penalty as well as arbitrary action in discipline. Instead of taking one isolated and narrowly construed sentence of § 22 (a), we should look to the entire framework of the act, the intents and purposes of the act and the means by which it has been given construction, effect and operation during its years of existence. We understand that the Personnel Board has adopted a construction which has prevailed through the years. What we are here saying was well stated in City of Birmingham v. Hendrix, 257 Ala. 300, 58 So.2d 626.

Upon a careful consideration we determine that Rule 14.7 adopted by the Civil Service Board furthers and promotes the purposes of the Civil Service Act. It is not in conflict with Section 22 (a) and in construing the act, this court will not apply the maxim expressio unius est exclusio alterius when to do so would mean the paralysis of a quasi-judicial tribunal designed for high and worthy aims. We do not consider that Rule 14.7 is legislative but on the contrary consider it is administrative in both its origin and its intent. Heck v. Hall, supra.

Since we have shown that Rule 14.7 is valid, the court was in error in vacating the order of the Personnel Board and in not affirming the order of the Personnel Board. In this connection it is well to point out that the circuit court decided the case on the evidence adduced before the Personnel Board. Accordingly, the judgment of the lower court is reversed and the cause is remanded with instructions that the order of the Personnel Board of Mobile County of June 3, 1953, be reinstated.

Reversed and remanded with instructions.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.